CLERK'S OFFICE
A TRUE COPY
Sep 18, 2026
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
253 South Ridge Street, #1, Hustisford, Wisconsin 53034; 2021 Volkswagen Tiguan bearing Wisconsin license plate BDU-5505 and the person of Berik NICOLSON (DOB: xx/xx/1981), as more fully described on Attachment A

Case No. 26-MJ-502 (SCD)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Eastern District of Wisconsin *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before 10-2-26 *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m. ❒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Honorable Stephen C. Dries.
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ❒ until, the facts justifying, the later specific date of ____________.

Date and time issued: 9-18-26. 9:30 am

Stephen C. Dries
*Judge's signature*

City and state: Milwaukee, WI

Honorable Stephen C. Dries - U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

**Attachment A**

DESCRIPTION OF LOCATIONS TO BE SEARCHED

The entire property located at 253 South Ridge Street #1, Hustisford, Wisconsin. The property address represents one apartment in a building consisting of approximately 11 units. This warrant authorizes the search of the SUBJECT PREMISES (Apartment #1 only).

The SUBJECT PREMISES has multiple windows facing the street, blue and white siding, and a flat grey roof. The SUBJECT PREMISES has an asphalt and dirt driveway that leads to a covered parking structure behind the main apartment building. The SUBJECT PREMISES is located in the northeast section of the building.

This warrant also authorizes the search of the Subject's vehicle, a 2021 Volkswagen Tiguan, Wisconsin license plate number BDU-5505.

This warrant also authorizes the search of the Subject believed to currently reside at the SUBJECT PREMISES, specifically BERIK NICHOLSON, date of birth January 13, 1981.

Pictures of the residence and vehicle are provided below:






WISCONSIN
BDU-5505

## <u>Attachment B</u>

<u>Items to Be Seized</u>

1. All records and information that constitute **fruits, contraband, evidence, and instrumentalities** of violations of Title 18 U.S.C. § 2251(a) (Production of Child Pornography) and Title 18 U.S.C. § 2252A(a)(5)(B) (Possession of Child Pornography) involving Berik NICHOLSON.

2. Electronic devices used as facilitating property, instrumentalities or containers for contraband an evidence of the SUBJECT OFFENSES, including cell phones, computers, computer hardware, computer software, computer related documentation, computer passwords and data security devices, videotapes, video recording devices, video recording players, and video display monitors that are or may be used to visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica.

3. Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

4. Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

5. All originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

6. Any and all diaries, address books, names, and lists of names and addresses of individuals who may have been contacted by the operator of any device by use of the computer or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

7. Any and all notes, documents, records, invoices, materials or correspondence:

a. identifying persons transmitting, through interstate or foreign commerce by any means any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2);

b. concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2);

c. concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography;

d. concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members;

e. concerning any accounts with an Internet Service Provider; and/or

f. concerning online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

8. Any and all cameras, film, videotapes or other photographic equipment.

9. Any and all visual depictions of minors.

10. Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, including by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

11. Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

12. For any electronic storage device, computer hard drive, electronic device, or other physical object upon which electronic information can be recorded that is called for by this warrant or that might contain records and information relating to the SUBJECT OFFENSES:

a. Information about who used, owned, or controlled the device at the time the records and information subject to seizure described in this warrant were created,

edited, or deleted, such as information about Internet Protocol addresses used by the device, logs, configuration files, saved usernames and passwords, “home screen” or “desktop” images selected by the user for the device, documents, browsing history, user profiles, email, contacts, “chat,” instant messaging logs, and photographs;

b. Device “set up” or “registry information,” such as a “recovery” email address, any associated account names or identifiers, any associated credit or payment account information, and the user-selected country, time zone, and language selected for the device;

c. Information indicating how and when the device was accessed or used as it relates to the SUBJECT OFFENSES;

d. Information about the attachment to the device of other electronic storage devices as it relates to the SUBJECT OFFENSES;

e. evidence indicating how and when the electronic storage device was accessed or used to determine the chronological context of electronic storage device access, use, and events relating to crime under investigation;

f. evidence of the attachment to the electronic storage device of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic storage device;

h. evidence of the times the electronic storage device was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the electronic storage device;

j. documentation and manuals that may be necessary to access the electronic storage device or to conduct a forensic examination of the electronic storage device; and;

k. contextual information necessary to understand the evidence described in this attachment.

l. Records and things evidencing the use of the Internet Protocol addresses to communicate with the internet, including:

i. routers, modems, and network equipment used to connect electronic storage devices to the Internet;

ii. records of Internet Protocol addresses used; and

iii. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

m. Information about software that would allow others to control the device, such as viruses and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

n. Information about counter-forensic programs (and associated data) that are designed to eliminate data from the device;

o. passwords, encryption keys, and other access devices that may be necessary to access the device; and

p. documentation and manuals that may be necessary to access the device or to conduct a forensic examination of the device.

As used above, the terms "records" and "information" include all the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of electronic storage device or electronic storage; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form.

During the execution of the search of the premises described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) of any persons to the Touch ID sensor of device(s) or scan for facial recognition, such as an iPhone, Android, or Tablet, found at the premises for the purpose of attempting to unlock the device via fingerprint or facial recognition in order to search the contents as authorized by this warrant. If facial recognition is required, the subject(s) will remain still and look, with eyes open, at the camera for any devices seized in connection with this warrant for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

CLERK'S OFFICE
A TRUE COPY
Sep 18, 2026
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

253 South Ridge Street, #1, Hustisford, Wisconsin 53034; 2021 Volkswagen Tiguan bearing Wisconsin license plate BDU-5505 and the person of Berik NICOLSON (DOB: xx/xx/1981), as more fully described in Attachment A

Case No. 26-MJ-502 (SCD)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 2251(a) | Production of child pornography |
| 18 U.S.C. § 2252(a)(5)(B) | Possession of child pornography |

The application is based on these facts:

See attached affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of ______ days *(give exact ending date if more than 30 days:* ______ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature]
*Applicant's signature*

Andrew Meiszberg, Special Agent - FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: September 18, 2026

[signature]
*Judge's signature*

City and state: Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Andrew Meiszberg, being first duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I have been employed as a Special Agent with the FBI since March 2019 and am currently assigned to the Minneapolis Division, Minot Resident Agency. My duties include, among other things, the investigation of violent crimes occurring within Indian Country. While employed by the FBI, I have investigated and participated in investigations involving federal criminal violations related to innocent images, child exploitation, sexual assault, violent crime and counter terrorism. As a Federal Agent, I am authorized to investigate violations of laws of the United States, and to execute warrants issued under the authority of the United States.

2. The facts contained in this affidavit are known to me through my personal knowledge, training, and experience, and through information provided to me by other law enforcement officers, who have provided information to me during the course of their official duties and whom I consider truthful and reliable.

3. Based upon my training and experience and the information described below, I submit that probable cause exists to believe that Berik NICHOLSON, hereinafter NICHOLSON, Date of Birth (DOB) 01/13/1981, a resident of **253 South Ridge Street #1, Hustisford, Wisconsin**, hereinafter the **SUBJECT PREMISES**, has committed violations of Title 18 U.S.C. § 2251(a) (Production of Child Pornography) and Title 18 U.S.C. § 2252A(a)(5)(B) (Possession of Child Pornography) (hereinafter the **SUBJECT OFFENSES**). There is also probable cause to search the **SUBJECT PREMISES**, described in Attachment A, for evidence, instrumentalities, contraband and fruits of these crimes, more particularly described in Attachment B.

4. The applied-for warrant would authorize the search of the **SUBJECT PREMISES** and the seizure of records and information that constitute fruits, contraband, evidence, and instrumentalities of the **SUBEJECT OFFENSES** as further described in Attachment B.

5. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**DEFINITIONS**

6. The following definitions apply to the Affidavit and to Attachment B of this Affidavit:

a. "Child Pornography" is defined in 18 U.S.C. § 2256 as any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct. Child pornography is also commonly referred to as Child Sexual Abuse Material, or "CSAM."

b. "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

c. The "cloud" is a general term for on-demand computing resources, including data storage, servers, databases, networking, and software. These services are hosted

by third-party providers and delivered over the internet to subscribers. Google Drive is one common example of cloud storage. A user can store files on Google Drive and access them from any capable device.

d. "Cookies" are small files of personalized information that a web server generates and sends to a web browser. Web browsers store the cookies they receive and recall them when a user subsequently accesses that site. Cookies help associate website activity with a specific user.

e. The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

f. "An Internet Protocol address" (IP address) is a unique numeric address used by internet-enabled electronic storage devices to access the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every electronic storage device attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that electronic storage device may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static that is, long-term IP addresses, while other computers have dynamic that is, frequently changed IP addresses.

g. "Minor" means any person under the age of eighteen years. See 18 U.S.C. § 2256(1).

h. The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including

writings and drawings), photographic form (including prints, negatives, videotapes, motion pictures, and photocopies), mechanical form (including printing and typing) or electrical, electronic or magnetic form (including tape recordings, compact discs, electronic or magnetic storage devices such as hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, smart cards, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

i. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person. See 18 U.S.C. § 2256(2).

j. "Visual depictions" include undeveloped film and videotape, and data stored on a computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

k. "Website" consists of text pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from the web servers to various web clients via Hyper-Text Transport Protocol.

**ELECTRONIC STORAGE DEVICES AND FORENSIC ANALYSIS**

7. As described above and in Attachment B, this application seeks authorization to search for and seize records and information that might be found on the **SUBJECT PREMISES** in whatever form they are found. One form in which the records and information might be found is data stored on an electronic device. Thus, the warrant applied for would authorize the search

and seizure of electronic devices and the seizure or copying of electronically stored information, all under Rule 41(e)(2)(B).

8. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying electronic devices and electronically stored information that reasonably could contain records and information described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may involve techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the medium to inspection to identify items that are seizeable under the warrant.

9. Based on the information in the Probable Cause section of this affidavit and my training and experience, I submit that there is probable cause to believe that records and information described in Attachment B are likely to be stored on electronic devices found on the **SUBJECT PREMISES**, and may be identified through forensic examination, for reasons including the following:

a. Based on my knowledge, training, and experience, I know that electronic files and information and remnants of files and information can be recovered months or even years after they have been stored on or deleted from an electronic device or viewed via the Internet. Information can be stored at little or no cost. Even when information has been deleted, it sometimes can be recovered months or years later using forensic tools. This is so because, typically, when a person "deletes" a file or information, the operating system may not immediately erase the data; instead, the system may instead remove the pointer or reference that links the file's location within the device's storage medium. Some or all of the deleted data may then remain on the storage medium until it is overwritten by new data.

b. Additionally, in modern operating systems, a piece of information (e.g., text message, notification, photo, or location coordinates) may be written to several locations on the electronic device. When the primary item (e.g., a text message) is deleted, the other copies of the data may be unaffected and remain long after the deletion of the primary item.

c. In addition to user-generated files, electronic devices contain records that can help demonstrate how the device was used, what it was used for, and who has used it. Operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or page files can all be useful in answering such questions. Some of this information is routinely recorded by the operating system or by applications as part of a device's normal functioning. Electronic device users typically do not erase or delete this evidence, because specialized software is usually required for that task.

d. Additionally, most current operating systems (such as iOS, Android, and Microsoft Windows), as well as individual applications, routinely include features that utilize cloud services to synchronize data across multiple electronic devices linked to the same user account or service. These synchronization features—often enabled by default—can provide access to files, internet activity, photos, emails, text messages, and other forms of electronically stored information from any of the user's electronic devices. For example, when an iPhone user takes a photograph with their phone, the photo can be nearly instantaneously synchronized across all their linked Apple devices (e.g., iPad, laptop, desktop) that are connected to the same Apple account. This synchronization functionality means that evidence within the parameters of Attachment B created on one device but subsequently deleted may still reside on other electronic devices if those devices have not yet received or processed the deletion signal or synchronized the update.

10. *Forensic evidence*. As further described in Attachment B, this application seeks permission to search for and to seize both records that serve more directly as evidence of the **SUBEJECT OFFENSES** and forensic electronic evidence that establishes how electronic devices storing any such records were used, the purpose of their use, who used them, and when, as is relevant to the records described previously. Forensic electronic evidence also can help to identify and locate additional evidence of the **SUBEJECT OFFENSES**. There is probable cause to believe that such forensic electronic evidence will be on electronic devices in the **SUBJECT PREMISES** because data on the electronic device can provide information about a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs, among others, store configuration information that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the electronic device was in use. Electronic device file systems can sometimes record information about the dates files were created and the sequence in which they were created.

11. Additionally, some information stored on an electronic device may provide evidence relating to the physical location of other evidence or suspects. For example, an image stored on a device may have geolocation information incorporated into its file data. Such file data also may contain information indicating when the file or image was created. Information from such image files, along with external device connection logs, may also indicate the use of additional electronic storage media that may contain evidence of the **SUBJECT OFFENSES** (*e.g.*, a digital camera or cellular phone with an incorporated camera).

12. Additionally, information stored on an electronic device may provide relevant insight into the device user's state of mind as it relates to the **SUBJECT OFFENSES**. For example, information on the electronic device may indicate the user's motive and intent to commit child exploitation crimes or consciousness of guilt (*e.g.*, running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence to conceal it from law enforcement).

13. As explained herein, based on my training and experience, I know that certain file types, artifacts, automatic processes, logs, and deleted information may require the use of additional forensic and contextual analysis to: (a) evaluate whether forensically recovered information falls within the parameters of Attachment B and (b) identify and understand both inculpatory and exculpatory information on the electronic device.

14. *Timestamps, compound files, and databases.* I know through my training and experience and my communications with forensic experts that different electronic device operating systems and programs use multiple "timestamps" for information stored within devices. As further described below, these timestamps can be altered by automated processes. Because electronic devices employ timestamps to facilitate the functioning of the operating system or program, the timestamps for a particular file may present in idiosyncratic ways that require further analysis to understand. For example, operating system and application updates for electronic devices can change timestamps for information stored on the electronic device and can alter where information is stored on the device and the directories and databases associated with the information.

15. Also based on my training and experience and my communications with forensic experts, I know that electronic devices can contain databases and other compound files. A

database or a compound file, such as a .rar or .zip file, will have timestamps for the container file, but also may contain many other files, data or logs, each with additional timestamps. I know that additional forensic and contextual analysis is often necessary to understand whether information contained in databases and compound files falls within the parameters of Attachment B.

16. *Information for which no timestamps exist.* Additionally, some information in current operating systems is often stored in formats that lack timestamps. For example, as discussed above, when information is deleted from an electronic device, current operating systems do not immediately erase the data. I understand that, depending on the operating system and electronic device, timestamps associated with deleted information may have changed or have been removed when that information was deleted. Advanced forensic tools and contextual investigation may help analysts and investigators understand whether deleted information that is forensically recovered falls within the parameters of Attachment B.

17. *User attribution information.* In my training and experience, information stored on an electronic device (e.g., registry information, communications, images and videos, transactional information, records of session times and durations, internet history, anti-virus, spyware, and malware detection programs) can provide information about the use and control of the electronic device that is relevant to the **SUBJECT OFFENSES** and the authentication of evidence stored on the electronic device. This "user attribution" information can provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

18. User attribution evidence for electronic devices can be closely akin to evidence showing "indicia of occupancy" in the context of the execution of a residential search warrant. Information about the use or control of an electronic device can be highly relevant evidence in a criminal investigation.

19. Electronic device activity can indicate who used, owned, or controlled the device at times that are relevant to the **SUBJECT OFFENSES**. For example, as described herein, many electronic devices contain logs of user account session times and durations, device activity associated with user accounts, electronic storage media that connected with the device, and the IP addresses through which the electronic device accessed networks and the Internet. Such information can inform the chronological context of electronic device access, use, and events relating to the investigation of the **SUBJECT OFFENSES**. In addition to showing use and control of the electronic device, such user-attribution information can be relevant to authenticating evidence obtained from the device. Similarly, the existence or absence of anti-virus, spyware, and malware detection programs may be used to explain the likelihood that the computer was remotely accessed, addressing claims of how a record got on the electronic device.

20. Some types of information that can be strongly indicative of use or control of an electronic device include:

a. Set up or registry information. I know in my training and experience that when users purchase or acquire an electronic device, as part of the device set up, the user will typically enter their name, a "recovery" email address, an associated account if any (e.g., an Apple account (for iPhones or other devices that use the iOS operating system), Google account (for Android cellular phones), or a Microsoft account (for a device running Windows)), country, time zone, language, and sometimes an associated credit card number.

b. In addition, in my training and experience, I know that electronic device users typically modify the "wallpaper," "home screen," or "desktop" of electronic devices soon after acquiring the devices. Second, I know in my training and experience that electronic device users often customize the "wallpaper," "home screen," or "desktop" of electronic devices with images of themselves, or other persons, places, or things that are important to the device user. Such images are typically visible every time the user accesses the electronic device and are strongly indicative of use and control.

c. The "contacts" or "address book" on an electronic device can be strongly indicative of who uses and controls the device. Such contacts are often set up as soon as the user acquires the device (sometimes automatically by the vendor, through synchronization with an existing account, or through another process (e.g., "Airdrop" with iPhones)) and are added to incrementally over time.

21. I know that when an individual uses an electronic device to commit crimes like the **SUBJECT OFFENSES**, the individual's electronic devices will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The device is also likely to be a storage medium for evidence of crime and for contraband. From my training and experience, I believe that an electronic device used to engage in criminal activity of the kind described above may contain: data that is evidence of how the device was used; data that was sent or received; information as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

22. *Necessity of seizing or copying entire electronic devices.* In many cases, a thorough search of a premises for information that might be stored on electronic devices will require the physical seizure or copying of electronic devices and later off-site review consistent with the warrant. In lieu of removing electronic devices from the premises, it is sometimes possible to make a copy or forensic image of electronic devices. Forensic imaging can often take a comprehensive electronic picture of the computer's data, including hidden sectors and deleted files. Similarly, an extraction of a cell phone can often make an extensive copy of the cell phone's data. Either physical seizure of or copying data from an electronic device is often necessary (in addition to or instead of on-site review) because these techniques help to enable the review of data stored on the electronic device and prevent the loss of the data from either accidental or intentional destruction. This is true because of the following:

a. *The time required for an examination.* As noted above, not all evidence takes the form of documents and files that can be easily viewed and analyzed on site in a timely manner. Analyzing evidence of how an electronic device has been used, what it has been used for, and who has used it may require considerable time, and taking that much time on premises could be inefficient or even unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to examine electronic devices with special tools and expertise, and potentially for a substantial amount of time, to obtain such evidence. Electronic devices can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and possibly unduly intrusive to attempt on site.

b. *Technical requirements.* Electronic devices can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.

Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of electronic devices available makes it difficult to know before a search what tools or knowledge will be required to search for evidence on electronic devices at the Premises. However, taking the electronic device off site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. *Variety of forms of electronic media.* Records sought under this warrant could be stored in a variety of storage media formats that may require off-site review using specialized forensic tools.

23. In light of these concerns, I hereby request the Court's permission to seize the electronic storage devices, associated storage media, and associated peripherals that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the hardware, media, or peripherals on-site for this evidence.

## **BIOMETRIC ACCESS TO DEVICES**

24. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

25. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

26. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

27. If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera

detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

28. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

29. As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

30. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar

restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

31. Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, I request authority for law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of NICHOLSON to the fingerprint scanner of the devices found at the **SUBJECT PREMISES**, or on NICHOLSON's person; (2) hold the devices found at the **SUBJECT PREMISES**, or on the person of NICHOLSON in front of his face to activate the facial recognition feature; and/or (3) hold the devices found at the **SUBJECT PREMISES**, or on the person of NICHOLSON in front of NICHOLSON's face and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.

**BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET**

32. I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience, and knowledge, I know the following:

a. Computers, cellular telephones, and other electronic storage devices (collectively electronic storage devices) have dramatically changed the way in which individuals interested in child pornography interact with each other. Electronic storage devices basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

b. Child pornographers can now transfer printed photographs into a computer-readable format with a device known as a scanner. Furthermore, with the advent of

digital cameras, when the photograph is taken it is saved as a digital file that can be directly transferred to a device by simply connecting the camera to the electronic storage device. In the last ten years, the resolution of pictures taken by digital cameras has increased dramatically, meaning the photos taken with digital cameras have become sharper. Photos taken on a digital camera are stored on a removable memory card in the camera. These memory cards often store terabytes of data, which provides enough space to store thousands of high-resolution photographs. Video recorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a hard drive in the camera. The video files can be easily transferred from the video recorder to a computer. Many electronic storage devices (e.g., computers, cellular telephones, and tablets), have cameras built into the device which allows users to create and store still and video images on the device. Moreover, if the device has internet connectivity, users can distribute still and video images from the device.

c. Internet-enabled electronic storage devices can connect to other internet-enabled devices the world over. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography. Child pornography can be transferred via electronic mail or through file transfer protocols (FTPs) to anyone with access to an internet-enabled electronic storage device. Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging"), and easy access to the Internet, electronic storage devices are the preferred method of distribution and receipt of child pornographic materials.

d. Electronic storage devices are the ideal repository for child pornography. The amount of information that an electronic storage device can hold has grown exponentially

over the last decade. Electronic storage devices can store thousands of images at very high resolution. In addition, there are numerous options available for the storage of computer or digital files. One-terabyte external and internal hard drives are not uncommon. Other media storage devices include CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on a computer or other electronic storage device. It is extremely easy for an individual to take a photo with a digital camera, upload that photo to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices (CDs and DVDs are unique in that special software must be used to save or "burn" files onto them). Many electronic storage devices can easily be concealed and carried on an individual's person.

e. The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f. Individuals also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Google, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any internet-enabled electronic storage device. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's electronic storage device in most cases.

g. As is the case with most digital technology, communications by way of electronic storage device can be saved or stored on the device. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained

unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, electronic storage device user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

h. Based on my knowledge, training, and experience, I know that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

33. Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage.

34. Additionally, based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of so-called

"wireless routers," which create localized networks that allow individuals to connect to the Internet wirelessly. Though wireless networks may be "secured" (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or "unsecured" (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network. Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

35. Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who transport, distribute, receive, possess, and/or access with intent to view child pornography:

a. Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b. Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further,

they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area. These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, or, at times, on their person, to enable the individual to view the child pornography images, which are valued highly. Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

d. Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices using forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.

e. Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f. Such individuals prefer not to be without their child pornography for any prolonged period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world. Therefore, even if an individual uses a portable device (such as a mobile phone) to access the internet and child pornography, it is

more likely than not that evidence of this access will be found in the **SUBJECT PREMISES** as set forth in Attachment A.

**BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE**

36. On or about January 5, 2026, the Bureau of Indian Affairs (BIA) advised the FBI – Minot Resident Agency that a report, described further below, had been made stating that Berik Nicholson, hereinafter “NICHOLSON,” had sexually abused his stepdaughter, JANE DOE, DOB XX/XX/2008, hereinafter “JANE.” BIA communicated there were possible video recordings from JANE's bedroom that may have recorded the sexual abuse. At the time of the offense, NICHOLSON and JANE resided in Turtle Mountain Indian Reservation (TMIR) in North Dakota.

37. On or about January 5, 2026, BIA provided FBI with a Suspected Child Abuse or Neglect (SCAN) Report that came from JANE’s brother, JOHN DOE, DOB XX/XX/2009, hereinafter “JOHN.” The SCAN Report indicated JOHN had reported concerns that his stepfather, NICHOLSON, was doing something to his sister, JANE, and that there were videos of her in her bedroom. Subsequently, the FBI interviewed JOHN, who stated he lived with his mother, whose identity is known to law enforcement and who is referred to hereinafter as “JANE’s MOTHER” to protect JANE’s identity, and stepfather, NICHOLSON, on TMIR. JANE’S MOTHER told NICHOLSON to leave the house for a few weeks during Christmas break because of inappropriate things that occurred between NICHOLSON and JANE. JOHN was not aware of the details of what happened but knew NICHOLSON did "gross things" to JANE and that small cameras that recorded were found in JANE's room. JANE told JOHN that it had been going on for a couple years.

38. On or about January 15, 2026, the FBI interviewed JANE. JANE disclosed that in approximately December 2025, JANE found a camera hidden amongst her stuffed animals on a shelf in her closet. There was black electrical tape over the lights on the camera. JANE usually dressed in her bedroom after she showered. JANE engaged in consensual sex with her boyfriend in the room. JANE's best friend also hung out with her in her bedroom and dressed in her bedroom. JANE was concerned these activities were recorded on the camera. JANE stated NICHOLSON used to sneak into JANE's bedroom at night when she was sleeping. NICHOLSON went into JANE's room at night, took the blankets off her, and touched her legs, specifically her thigh area. When JANE woke up, NICHOLSON left the room. One day, JANE got out of the shower and saw something that she thought was a phone in the bathroom. NICHOLSON told her she was hallucinating and did not see anything. JANE'S MOTHER also recently told JANE that she discovered NICHOLSON had video recordings of the females in JANE's family on his phone when they were in the bathroom.

39. On or about January 15, 2026, FBI interviewed JANE'S MOTHER. During the interview JANE'S MOTHER explained she was separated from NICHOLSON and that NICHOLSON was currently residing in Wisconsin. JANE'S MOTHER recalled seeing approximately 12 videos on NICHOLSON's cell phone in approximately July 2024. The videos appeared to have been secretly recorded in the bathroom at her house. The videos were of JANE'S MOTHER, JANE, another adult daughter of JANE'S MOTHER, and her adult daughter's boyfriend. The videos depicted them naked, using the toilet, and showering. JANE'S MOTHER confronted NICHOLSON about the videos on his cell phone. In December 2025, JANE also discovered a hidden black square camera in her bedroom prior to JANE'S MOTHER and NICHOLSON separating. JANE'S MOTHER told NICHOLSON to leave the residence after

the camera was discovered. JANE'S MOTHER found an SD card in the camera. From the SD card in the camera, JANE'S MOTHER was able to access at least one video recording. In the video, JANE'S MOTHER saw JANE after she had showered and was getting ready in her bedroom. JANE was naked. JANE'S MOTHER saw JANE's breasts, buttocks, and vaginal area in the video. JANE laid down on her bed nude at one point before she began to dress in the video. JANE's 16-year-old female friend was also in the video. JANE'S MOTHER saw her in her bra and underwear in JANE's bedroom. JANE'S MOTHER advised she was able to view the purchase history of her joint Amazon account with NICHOLSON prior to him removing her from the account and discovered NICHOLSON had purchased the camera discovered in JANE's room from Amazon in approximately August 2024. JANE'S MOTHER also noticed that NICHOLSON had purchased more than one camera like that. JANE'S MOTHER and JANE were unsure if NICHOLSON still had cameras hidden in the house or if he had them with him.

40. On or about January 19, 2026, JANE'S MOTHER conducted a consensual recorded phone call at the FBI Minot RA. During the call, JANE'S MOTHER confronted NICHOLSON regarding his behavior with her daughter JANE. JANE'S MOTHER asked NICHOLSON how and why he had videos of JANE and JANE's sister in the bathroom shower of JANE'S MOTHER's home and not anyone else. NICHOLSON denied putting a camera in the bathroom and did not know how the videos of the two girls in the shower were recorded and on his phone. NICHOLSON admitted to placing camera recording devices in JANE's room with black tape to cover the lights in an effort to conceal the camera. NICHOLSON placed a camera in JANE's room for a couple of months, after the bedroom door and lock were installed in JANE's room. The camera footage could only be watched live on Wi-Fi from NICHOLSON's phone. NICHOLSON was not sure about the SD card found in the camera. JANE'S MOTHER

also asked NICHOLSON why he was in JANE's room while she was at school or at night when she was sleeping. NICHOLSON claimed to be going into JANE's room to find his possessions (flashlight, tape, scissors, etc.) that JANE uses. NICHOLSON explained he would go into JANE's room to grab laundry, help JANE move furniture, or to get the cats.

41. On or about January 7, 2026, JANE'S MOTHER provided a small black square-shaped camera model CB71 to the FBI. The camera had been found in JANE's bedroom in Belcourt, ND. Attempts to review digital media from the device's external SD card were unsuccessful.

42. On or about June 3, 2026, during an interview with the FBI, JANE'S MOTHER provided NICHOLSON's email address: berik49@gmail.com. JANE'S MOTHER stated that NICHOLSON had recently relocated to Hustisford, Wisconsin. JANE'S MOTHER described NICHOLSON's electronic devices: a white Dell all-in-one computer with a white or silver USB drive inserted into it, a Samsung Galaxy cell phone, a Samsung Galaxy tablet and a Kindle tablet.

43. On or about June 23, 2026, Google responded to a Federal Search Warrant for Google Drive account berik49@gmail.com. Images of interest located on the Google Drive account included: app_parts_4184_4184, app_parts_4187_4187, app_parts_4186_4186, app_parts_4185_4185, app_parts_4188_4188 and app_parts_4189_4189. These .jpg images depicted the inside of a bathroom. Additional images app_parts_8827_17649.jpg, app_parts_8829_17652.jp and, app_parts_8830_17651.jpg appeared to be close-up images of a female vulva with no pubic hair, possibly a pre-pubescent female. Based on the file folder location for the above images, it is believed these files were saved on the Google Drive during a device back-up.

44. On or about June 29, 2026, FBI Special Agent Andrew Meiszberg interviewed JANE'S MOTHER. NICHOLSON provided his current address to JANE'S MOTHER via text message: **253 South Ridge St., Hustisford, Wisconsin 53034.** JANE'S MOTHER provided the physical address of NICHOLSON's apartment complex, the unit number (Unit #1), was later identified through the use of law enforcement databases.

45. On or about July 6, 2026, FBI Special Agent Andrew Meiszberg interviewed JANE'S MOTHER and her daughter, JANE. JANE was shown some of the above-mentioned images obtained via a Federal Search Warrant from Google. JANE confirmed that the images app_parts_4184_4184, app_parts_4187_4187, app_parts_4186_4186, app_parts_4185_4185, app_parts_4188_4188 and app_parts_4189_4189 were taken from inside the bathroom of her residence. JANE noted NICHOLSON's shoe in the frame of one photo. JANE was also shown app_parts_8827_17649.jpg, app_parts_8829_17652.jp and, app_parts_8830_17651.jpg. JANE stated that these images were not of her vaginal area. JANE'S MOTHER also denied these images were of her vaginal area. JANE'S MOTHER, however, did recognize the towel shown in app_parts_8827_17649.jpg as one NICHOLSON had purchased in Minot and had taken with him when he relocated to Wisconsin.

46. On or about August 3, 2026, Amazon.com responded to a Federal Search Warrant for purchase history for accounts associated with berik49@gmail.com. Returns reviewed by the FBI listed one completed order placed by customer Berik L. Nicholson on May 30, 2024 for "WiFi Mini Camera | Hidden Spy Camera | Free Cloud Storage & 32G SD Card, 2024 4K HD Smallest Cam, 150 Days Standby Time, Surveillance Wireless Camera with AI Motion Detection, Auto Night Vision." The item was shipped to 13XX Francis Sinclaire St., Belcourt,

ND. FBI Minot RA Special Agents recognize this address as the Belcourt Police Department, where NICHOLSON was previously employed.

47. Between August 26, 2026, and September 10, 2026, FBI's Milwaukee Field Office conducted multiple surveillance shifts on the SUBJECT PREMISES and NICHOLSON. A grey 2021 Volkswagen Tiguan, Wisconsin plate BDU-5505, was spotted in a covered parking structure next to the SUBJECT PREMISES. This vehicle is registered to NICHOLSON. During one surveillance shift NICHOLSON was observed departing from an industrial bakery in Columbus, Wisconsin (his workplace) at approximately 6:00 AM and driving to the SUBJECT PREMISES in WI BDU-5505.

## CONCLUSION

48. I respectfully request that this Court issue a search warrant for the location, and search of persons described in Attachment A authorizing the seizure and search of the items described in Attachment B.

**Attachment A**

DESCRIPTION OF LOCATIONS TO BE SEARCHED

The entire property located at 253 South Ridge Street #1, Hustisford, Wisconsin. The property address represents one apartment in a building consisting of approximately 11 units. This warrant authorizes the search of the SUBJECT PREMISES (Apartment #1 only).

The SUBJECT PREMISES has multiple windows facing the street, blue and white siding, and a flat grey roof. The SUBJECT PREMISES has an asphalt and dirt driveway that leads to a covered parking structure behind the main apartment building. The SUBJECT PREMISES is located in the northeast section of the building.

This warrant also authorizes the search of the Subject's vehicle, a 2021 Volkswagen Tiguan, Wisconsin license plate number BDU-5505.

This warrant also authorizes the search of the Subject believed to currently reside at the SUBJECT PREMISES, specifically BERIK NICHOLSON, date of birth January 13, 1981.

Pictures of the residence and vehicle are provided below:






WISCONSIN
BDU-5505

## **Attachment B**

Items to Be Seized

1. All records and information that constitute **fruits, contraband, evidence, and instrumentalities** of violations of Title 18 U.S.C. § 2251(a) (Production of Child Pornography) and Title 18 U.S.C. § 2252A(a)(5)(B) (Possession of Child Pornography) involving Berik NICHOLSON.

2. Electronic devices used as facilitating property, instrumentalities or containers for contraband an evidence of the SUBJECT OFFENSES, including cell phones, computers, computer hardware, computer software, computer related documentation, computer passwords and data security devices, videotapes, video recording devices, video recording players, and video display monitors that are or may be used to visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica.

3. Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

4. Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

5. All originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

6. Any and all diaries, address books, names, and lists of names and addresses of individuals who may have been contacted by the operator of any device by use of the computer or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

7. Any and all notes, documents, records, invoices, materials or correspondence:

a. identifying persons transmitting, through interstate or foreign commerce by any means any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2);

b. concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2);

c. concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography;

d. concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members;

e. concerning any accounts with an Internet Service Provider; and/or

f. concerning online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

8. Any and all cameras, film, videotapes or other photographic equipment.

9. Any and all visual depictions of minors.

10. Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, including by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

11. Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

12. For any electronic storage device, computer hard drive, electronic device, or other physical object upon which electronic information can be recorded that is called for by this warrant or that might contain records and information relating to the SUBJECT OFFENSES:

a. Information about who used, owned, or controlled the device at the time the records and information subject to seizure described in this warrant were created,

edited, or deleted, such as information about Internet Protocol addresses used by the device, logs, configuration files, saved usernames and passwords, “home screen” or “desktop” images selected by the user for the device, documents, browsing history, user profiles, email, contacts, “chat,” instant messaging logs, and photographs;

b. Device “set up” or “registry information,” such as a “recovery” email address, any associated account names or identifiers, any associated credit or payment account information, and the user-selected country, time zone, and language selected for the device;

c. Information indicating how and when the device was accessed or used as it relates to the SUBJECT OFFENSES;

d. Information about the attachment to the device of other electronic storage devices as it relates to the SUBJECT OFFENSES;

e. evidence indicating how and when the electronic storage device was accessed or used to determine the chronological context of electronic storage device access, use, and events relating to crime under investigation;

f. evidence of the attachment to the electronic storage device of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic storage device;

h. evidence of the times the electronic storage device was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the electronic storage device;

j. documentation and manuals that may be necessary to access the electronic storage device or to conduct a forensic examination of the electronic storage device; and;

k. contextual information necessary to understand the evidence described in this attachment.

l. Records and things evidencing the use of the Internet Protocol addresses to communicate with the internet, including:

i. routers, modems, and network equipment used to connect electronic storage devices to the Internet;

ii. records of Internet Protocol addresses used; and

iii. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

m. Information about software that would allow others to control the device, such as viruses and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

n. Information about counter-forensic programs (and associated data) that are designed to eliminate data from the device;

o. passwords, encryption keys, and other access devices that may be necessary to access the device; and

p. documentation and manuals that may be necessary to access the device or to conduct a forensic examination of the device.

As used above, the terms "records" and "information" include all the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of electronic storage device or electronic storage; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form.

During the execution of the search of the premises described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) of any persons to the Touch ID sensor of device(s) or scan for facial recognition, such as an iPhone, Android, or Tablet, found at the premises for the purpose of attempting to unlock the device via fingerprint or facial recognition in order to search the contents as authorized by this warrant. If facial recognition is required, the subject(s) will remain still and look, with eyes open, at the camera for any devices seized in connection with this warrant for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.